UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

*********************************************************************************************

In re:

JOHN F. HUONDER and  　　　　　　　　　　　ORDER DENYING DEFENDANT'S
TONNIE JO HUONDER, 　　　　　　　　　　　　MOTION FOR SUMMARY
　　　　　　　　　　　　　　　　　　　　　　　JUDGMENT

　　　　　　Debtors.

***********************************************

JOHN F. HUONDER and
TONNIE JO HUONDER,

　　　　　　Plaintiffs, 　　　　　　　　　　　　BKY 11-33359

v. 　　　　　　　　　　　　　　　　　　　　　　ADV 14-3089

CHAMPION MILKING SYSTEMS, LLC,

　　　　　　Defendant.

*********************************************************************************************

At St. Paul, Minnesota
July 10, 2015.

　　　　　　The plaintiffs in this adversary proceeding were the debtors in the underlying bankruptcy case under Chapter 7. They had commenced the case by a voluntary filing on May 19, 2011.[1] The Defendant ("CMS") was a pre-petition creditor of the Debtors. Paul Osborne is the owner of CMS. For their bankruptcy filing, the Debtors scheduled an unsecured, non-priority claim in favor of CMS, in the amount of $1,082.35.

　　　　　　The Debtors received their discharge in bankruptcy and their case was closed, in the ordinary course of the clerk's administration.[2] In early July, 2014--33 months later--the Debtors filed the complaint in this adversary proceeding. The Debtors now accuse CMS of "multiple and continuing violations" of their protections under the discharge injunction of 11 U.S.C. § 524(a), by

---

[1] Hence, the term "the Debtors" will be used for all further references to them.

[2] In specific: an order granting the Debtors' discharge was issued on September 14, 2011 [BKY 11-33359, Dkt. No. 20] and the case was closed on September 29, 2011.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 07/10/2015
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

acts to collect on the prepetition debt. They seek injunctive relief and awards of "compensatory damages, general damages, punitive damages, sanctions and attorney's fees for [CMS's] calculated disregard of 11 U.S.C. § 524 . . . ."

After CMS answered the complaint, discovery was conducted. The discovery included depositions of the Debtors taken at CMS's instance. CMS then moved for summary judgment. Through counsel, the Debtors sharply contested the motion. Their attorney insisted that this matter had to proceed to trial, to fully vindicate and compensate the Debtors on the acts that she alleges were taken against her clients.[3]

Through counsel, CMS candidly acknowledges a couple of basic facts in its submissions. The documentary record makes out a couple more. The bare uncontested facts are:

- CMS issued invoices on the debt after the Debtors received a discharge in bankruptcy. It sent the invoices to the Debtors' address.

- After sending the invoices, CMS commenced an action on the debt in the conciliation court in Mille Lacs County, on February 20, 2014. Its complaint was on a standard, fill-in-the-blanks form. CMS named "J-T Dairy, John and Tonnie Hounder [sic]" in the blank under "Defendant #1."

- CMS withdrew its conciliation court complaint against the Debtors before the scheduled date for hearing. In the document filed with the conciliation court, Tim Osborne asserted on behalf of CMS that it was withdrawing its claim "even though some of our labor and material was provided after [the] date" on which the Debtors filed for bankruptcy. The next sentence is: "We still hope to get paid for our materials and labor but will not pursue it in the courts at this time."

- On July 7, 2014--six days after the complaint in this adversary proceeding was filed--CMS issued another invoice to "J-T DAIRIES" alone, using the Debtors' home address.

- On July 15, 2014, Paul Osborne appeared in person at the Debtors' home. A conversation ensued between him and John Huonder.

---

[3] For the motion, CMS appeared by its attorney, Jeffrey A. Peterson. The Debtors appeared by their attorney, Barbara J. May.

2

- After appearing at the Debtors' home, Paul Osborne sent a letter to the Debtors via the United States mail. The letter was dated July 17, 2014. Its full content read:

    > I want to take the time to follow up with our visit on Tuesday. As I stated Champion did not intend for you to receive any additional statements after your bankruptcy. We had terrible turn over with our office position. My secretary of 24 years was killed in a car accident and have tried 3 new employees since without success. In this time statements had been sent without my knowledge. One of the new personnel were doing the collections and Jt Dairy statement was sent in for small claims by mistake and then dismissed. In summary I again apologize for our mistakes and reiterate that all was done without intent of collecting, items were sent because new employees were unaware of the bankruptcy. I plead to have the case against Champion dismissed.
    > I thank you in advance for your complete understanding.

- The Debtors' counsel sent a letter--also dated July 17, 2014--addressed and directed only to "CHAMPION MILKING SERVICE." At the top it bore a prominent blazon: "**NOTICE OF TRESPASS**." Counsel accused the addressee of "[driving] to [her] clients' home to personally confront them." After opining that the addressee had "violated [the Debtors'] discharge with impunity," she abjured the addressee to "be prepared for the consequences." She also gave warning: the addressee did "not want to hear what a bankruptcy judge ha[d] to say about [its] conduct."

From there, everything in the parties' submissions gets complicated. The tone of all further fact assertions from the Plaintiffs is shrill, combative, and rhetorical.[4] By contrast, the tone of the Defendant's submissions is technical, wary, and . . . defensive. None of this sheds much light on what really happened--i.e., most of the events and acts that would be material to the claims in suit.

---

[4] At one point, counsel puts the word "stalking" into John Huonder's mouth, through his affidavit. Really, now.

The murkiness is most likely the result of the lawyers' art. It is manifested in various ways:

- The Plaintiffs produced no evidence to establish just how many of the offending invoices were sent post-discharge; the frequency at which they were sent; the length of time over which this was done; or the wording used in them in relation to the Defendant's intention to collect. When challenged at oral argument as to the absence of the actual documents from the record for this motion, the Plaintiffs' counsel admitted that her clients had thrown away the invoices. The stated reason? "He's a farmer, your Honor . . . ."

- The record has little as to whether the Debtors ever responded to the sending of the invoices in any way before mid-2014--over a period that may have run several years. John Huonder states in affidavit that, "[a]fter receiving a number of these invoices, I called Defendant and asked that the billings stop. Defendant refused to stop, and continued to send the billings . . . ." The dearth of any detail about this communication--particularly the absence of attribution to any one person acting on behalf of CMS--reduces its facial weight substantially.

- The parties' submissions depict Osborne's in-person visit to the Debtors' farm in diametrically-opposed terms. In the affidavit, Osborne himself tersely describes his purpose and his actions as "apologiz[ing] to John Huonder at his residence . . . ." Equally tersely, Osborne states "John Huonder did not ask me to leave his residence . . . ." The text of John Huonder's own affidavit does not attribute any specific words to Osborne from this encounter. It is set up to portray something very different, however:

    > On July 15, 2014, Paul Osborne went to our home to confront me and tell me to drop the lawsuit. I was intimidated and made fearful by Mr. Osborne's threatening demeanor, and I was ashamed, embarrassed and humiliated in front of my children. I felt stalked and trapped and deeply afraid that even this lawsuit could not stop them. Osborne insisted that I go out on the deck to talk with him. I did not know what he was going to do to me.

    Affidavit of John Huonder, ¶ 16 [part of Dkt. No. 13, p. 25 of 26]. When deposed, John Huonder attested to having "hardly any" memory "of the conversation at all." Again, he

4

      testified far more to his own reaction to Osborne's appearance at the Debtors' house and the effect it might have on the members of his family. Tr., Depo. of John Huonder, 25 [part of Dkt. No. 11, p. 27 of 60]. He acknowledged that he "didn't tell [Osborne] to leave." *Id.*

- The record has nothing on how CMS came to use the term "J-T Dairies" to identify an account linked to work done on the Debtors' farm. Nor is there any evidence going to the factual or legal significance of the phrase "J-T Dairies," as to either side. It certainly is not clear whether CMS consistently used this name alone for the account debtor throughout, or whether it used it jointly with the Debtors' personal names at some time(s) as it did in its complaint in the conciliation court.

- The Debtors' submissions are quite cryptic as to their own notion of the significance of the name "J-T Dairies" in linkage to themselves personally, or to a separate, artificial business entity. Their statements are equivocal. First, in responding to CMS's discovery requests on the point, they state only that "J-T Dairy is a sign on the debtors' lawn." To somewhat different effect, John Huonder says in affidavit: "Neither I nor my wife has ever done business as 'J-T Dairy.' We have a lawn sign with that name on it, but it is not a business name." All of this begs the question of why the sign was even there, if what they say is true.

- In deposition and affidavit, John Huonder stated that he had had strong emotional reactions to the whole sequence of events and acts, whatever transpired in reality. In his deposition testimony, he attested variously to "sleeplessness, and stress, and anxiety," and Osborne's appearance at his home "caus[ing] a lot of stress for not only that time [Osborne] was there, but for quite a while after that." In his responsive affidavit for this motion, the phraseology got more laden. John Huonder attested to feeling "anxious and fearful" as a result of the "repeated billings" from CMS, prompting him to seek "treatment for [his] stress and anxiety" from a medical professional in October, 2012. He states that in the spring of 2014 he felt "anxiety and fear" that was "intolerable," after CMS "resumed sending invoices to [his] house"; this, he states, made him "extremely anxious all the time and prevented him from sleeping." In turn, he stated, this "led to medical problems affecting my whole family." He goes on in some detail about these physical manifestations. He states that Osborne's appearance at his house caused him to feel shame, fear, and humiliation. This, he says, resulted from having his family members watch the encounter through the windows of their house.

- At the same time, John Huonder admitted in deposition to previously experiencing anxiety and stress between late

5

      2009 and March 2011, during the time when his dairy operation was foundering due to a barn fire, low commodity prices, and the onset of bovine leukemia in his herd. He testified that he did *not* have any negative feelings of the sort from the procedures in his bankruptcy case that involved the Farm Service Administration of the U.S. Department of Agriculture. That creditor commenced an adversary proceeding in the case, which resulted in the Debtors stipulating that a debt owing to the United States was nondischargeable to the tune of $167,234.94. A money judgment in that amount was entered against the Debtors.

- In deposition, Tonnie Huonder attested to having had one epileptic seizure in recent times. In the same breath she stated in relation to the onset of her seizures, "it's not just because something happened" and that she generally experienced epileptic episodes "maybe one every three to four months."

- Per their attorney's statement at oral argument, the Debtors do not intend to proffer any expert testimony at trial, as to a causal link between the acts of Osborne and anyone else on behalf of CMS, and John Huonder's several symptoms of stress and anxiety. Nor did counsel offer a theory under which an award of damages would be quantified.

In moving for summary judgment as a defendant, CMS is making use of Rule 56 in the fashion of *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). That is to say, CMS waited until the parties had had adequate time for discovery, 477 U.S. at 322, 326; and after reviewing the fruits of both sides' discovery procedures and its own investigation, CMS now "point[s] out," 477 U.S. at 325, that there is no identifiable evidence to support findings in the Debtors' favor on one or more of the essential elements of their case against CMS. Thus, as CMS would have it, the Debtors would not be able to make out a prima facie case at trial due to that failure of proof; and so CMS is entitled to judgment in its favor on all of the Debtors' claims in suit, "as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. at 322-323 (". . . a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' . . . ."). If the Debtors do not produce countering evidence that would support findings in their favor on the controverted elements, CMS would be entitled to summary judgment. *Celotex Corp. V. Catrett*, 477 U.S. at 323.

To analyze CMS's motion, it is necessary to identify the elements that the Debtors must prove under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1987). The complaint frames up the claims against CMS solely in terms of "a violation of 11 [U.S.C. §] 524(a)(2)." Complaint [Dkt. No. 1], ¶ 1. Under § 524(a)(2), the grant of

> . . . discharge in a case under [the Bankruptcy Code]
>
> > . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . .

This relief is given through a statutorily-generated injunction that is activated by the issuance of a court order. *See* Fed. R. Bankr. P. 4004(e). Thus, a violation of the injunction is properly treated as a constructive civil contempt of the issuing court. *In re Atkins*, 176 B.R. 998, 1006 (Bankr. D. Minn. 1994). *See also In re Howard*, 307 B.R. 659, 664 (Bankr. D. Minn. 2004).

A party is in civil contempt of a court order where (1) the order is specific; and (2) the party acted knowingly, i.e. with knowledge of the order. *In re Atkins*, 176 B.R. at 1010 (citing *Hubbard v. Fleet Mortg. Co.*, 810 F.2d 778, 781 (8th Cir. 1987)).[5] In this context it is not necessary to prove willfulness, in the sense of a deliberate intent to flout the court by violating the discharge order. *Id.*[6] "[T]he absence of willfulness does not relieve [a party violating a court order or decree]

---

[5] *Hubbard* involved a violation of the automatic stay in bankruptcy, which arises under 11 U.S.C. § 362(a) by operation of law without the entry of an order. In *Hubbard*, the Eighth Circuit conceived of such a violation as a contempt of court. The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, § 304, 98 Stat. 333, 352 (1984) ("BAFJA") created a specific statutory remedy for violations of the stay under 11 U.S.C. § 362(h), now codified at 11 U.S.C. § 362(k). Much can be debated about whether contempt remedies properly lie for violations of the automatic stay; whether the enactment of § 362(h)/§ 362(k) preempted earlier contempt remedies or only cumulated to them; and whether the all-writs provision of 11 U.S.C. § 105 enables the bankruptcy court to redress such violations independently of all other legal governance. *E.g.*, *In re Calstar, Inc.*, 159 B.R. 247, 257-261 (Bankr. D. Minn. 1993). In the end, *Hubbard* is properly cited for the framing of the elements of constructive civil contempt in the context of bankruptcy, since its cited authority for those elements was rendered under general federal law. 810 F.3d at 781.

[6] In *Atkins*, it was noted that *Hubbard* had discussed willfulness as an element of contempt; but *Hubbard* had come out of proceedings originally commenced for an adjudication of *criminal* contempt. The Eighth Circuit had ultimately concluded that it had proceedings in the nature of both civil and criminal contempt before it. 176 B.R. at 1010 n.23 (citations omitted).

from civil contempt." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).[7] Once a civil contempt is established, the court may impose an appropriate remedial sanction in favor of the complainant, "to compensate for losses or damages sustained by reason of noncompliance" with the order. *In re Atkins*, 176 B.R. at 1009 (quoting *McComb,* 336 U.S. at 191.

In moving for summary judgment now, CMS wholly ignores the elephant in the center of the room: its motion, affidavits, and memorandum do not contain a single reference to its own actions or the accompanying knowledge or intent of Osborne and others on its behalf, the factual substance that the Debtors pleaded as the core of their claim. Rather, CMS seeks summary judgment on the other end of the Debtors' cause of action, and a peripheral part of it at that. CMS denies that the Debtors can establish, on evidence, a legally-cognizable and -compensable injury or loss, that would have resulted from the actions that the Debtors attribute to CMS. This is the sole potential hole in the Debtors' prima facie case, that CMS posits to argue for summary judgment in its favor on a *Celotex*-type approach.

CMS appears to argue that a complainant like the Debtors must be able to prove that a "specific" injury to itself resulted from a violation of a discharge injunction, to be entitled to an award of damages. It argues by analogy from *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263 (11th Cir. 2014).[8]

In *Lodge*, the Eleventh Circuit held that a debtor could maintain a claim for damages for violation of bankruptcy's injunctive relief by asserting emotional distress as the harm it sues on. However, the *Lodge* court rejected the claim of the debtors before it on the ground that they had

---

[7]Substantively, this contrasts with § 362(k); the statute mandates an award of damages to "an individual injured by any *willful* violation of a stay provided by" § 362. (Emphasis added.)

[8]*Lodge* was an action for damages under 11 U.S.C. § 362(k), commenced to redress a violation of the automatic stay by a foreclosing assignee-mortgagee that admitted its violation and its willfulness after the debtors sued it. Despite its origin at an earlier point in the timeline of a bankruptcy case, *Lodge* furnishes appropriate parallel authority and gives analytic focus for contempt actions that are premised on § 524(a). Aligning as they do in unbroken sequence, the protections of the automatic stay and the discharge injunction serve nearly identical interests of debtors in receiving full relief from the burden of debt, whether interim or permanent. Thus, the same sorts of considerations logically apply, when determining the nature of an alleged violation of either form of bankruptcy's injunctive relief to debtors, and the actionability of the resultant harm that a debtor alleges.

8

produced no more than "generalized evidence, without any additional, specific detail" as to the "emotional injury" they claimed to have undergone. 750 F.3d at 1272.

The *Lodge* court considered four previous circuit-level decisions, all of which addressed whether an award of damages under § 362(k) could be premised on emotional distress not linked to physical injury, physical manifestation, or actual economic loss. It conceded to the Ninth Circuit's acceptance of the general proposition in *In re Dawson*, 390 F.3d 1139 (9th Cir. 2004). However, it joined the other three circuits in casting a demanding and very skeptical eye over such claims due to their inherent subjectivity. 750 F.3d at 1271.

One sees why CMS relies on *Lodge*. The Eleventh Circuit's description of its debtors' manifestations and grievances is superficially similar to the case at bar: the debtors in *Lodge* learned that the mortgagee had initiated foreclosure after they were under the protection of bankruptcy in Chapter 13. They were left in uncertainty for a period of several weeks, until they learned that the creditor had stopped the foreclosure procedure. Both of the *Lodge* debtors underwent stress; engaged in hostile and emotional behavior against each other; lost sleep; had migraine headaches; consulted physicians for stress, back pain, and worsened acid reflux; and had difficulties performing at work. Both the district court (on cross-motions for summary judgment) and the Eleventh Circuit denied relief to the debtors in *Lodge*.

The Eleventh Circuit started by rejecting out of hand the debtors' suggestion that a "violation of the automatic stay alone constitutes an injury sufficient to allow [debtors] to recover . . . ." *Lodge*, 750 F.3d at 1268. It went on to hold that its debtors had not established the three elements of the *Dawson*-inspired test it adopted:

> . . . at a minimum, to recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay.

*Lodge*, 750 F.3d at 1271 (citing *Dawson*, 390 F.3d at 1149).

9

The *Lodge* court held its debtors to task for "fail[ing] to corroborate their injuries in any way," via evidence extrinsic to their own statements in affidavit. It also held that they had failed to "establish[ ] a causal connection between their injuries and the [creditor's] violation of the automatic stay," via medically-grounded proof that their professed symptoms resulted necessarily from the threat inherent in the creditor's action. 750 F.3d at 1272.

Probably most central to *Lodge*'s tone and analysis was the nature of the creditor's action that did violate the stay, at least in the abstract. Post-discharge, the creditor had issued a notice of sale in foreclosure of a mortgage against the debtors' homestead, and published it only once before cancelling further publication; and the debtors only learned of the single publication "some unspecified time" later, when they received communications from third parties, "law firms informing them that they were 'about to be foreclosed'." 750 F.3d at 1265.

The Eleventh Circuit clearly found this insufficient as actionable creditor misconduct. It tartly observed that "[t]here is no evidence that [the creditor] engaged in egregious misconduct, as [it] canceled the publication of the Notice of Sale the same day that it ran," and there was "no evidence that [the creditor] intended to harm the [debtors] by publishing the advertisement." 750 F.3d at 1272.

This latter ruling was made despite the fact that the automatic stay had indeed been in effect up to the later grant of discharge to the *Lodge* debtors--the creditor's predecessor-in-interest had filed a motion for relief from stay three months before the notice of sale was published, but the bankruptcy court had not ruled on the motion before the grant of discharge. The decision also indicates that the creditor never informed the debtors of its error in issuing the notice of sale. They did not find out about the cancellation of further publication and the termination of the foreclosure process until the very date for which the sale was noticed, some three weeks after they got the third-party letters. 750 F.3d at 1265.

CMS's principal reliance on *Lodge* is inapposite, however. *Lodge* is internally flawed in its inconsistent use of *Dawson*'s analysis. More crucially, *Lodge*'s more categorical approach

does not mesh with the Eighth Circuit's jurisprudence on remedies for violation of bankruptcy's injunctive relief, which a bankruptcy court within this circuit may not ignore.

First: in the way it imposed a burden of production, the Eleventh Circuit did not take heed of the central analysis of the very authority it purported to adopt, *Dawson*. The *Lodge* court dismissively rejected the claim of the debtors before it, characterizing their proffer as "generalized evidence, without any additional specific detail, of . . . emotional distress due to [a] Notice of Sale being published for a single day . . . ." *Lodge*, 750 F.3d at 1272. It also took its debtors to task for "fail[ing] to corroborate their injuries in any way." *Id*.

However, as to proof for a recovery of damages for emotional distress *Dawson* is much more deferential than that to debtors who have had their injunctive relief in bankruptcy violated by a creditor. Reasoning first that "the purpose of [the automatic stay] encompasses more than protection of financial interests," the *Dawson* court held that separate "pecuniary loss is not required in order to claim emotional distress damages . . . ." *Dawson*, 390 F.3d at 1149. But the *Dawson* court deliberately tried to avoid a floodgate for claims loosely based on subjective feelings. Rather, *Dawson* reined in such claims via its assessment of burdens of production:

> . . . to be entitled to damages for emotional distress . . . , an individual must (1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay . . . .

*Id*.[9]

Broadly phrased as they were, these burdens are demanding. But *Dawson* balances out its standard by recognizing alternate evidentiary avenues through which a debtor-complainant could prove the twin elements of "significant harm" from emotional distress and causality from a creditor's violation. Corroborating medical evidence was recognized as proper proof. But the *Dawson* court apparently did not set this up as essential on causality: it "*may* be offered," (emphasis

---

[9]The ellipses denotes the deletion of the words "under § 362(h) . . . ." *See* discussion in n.7, *supra*.

11

added). The testimony of observers to a debtor's "manifestations of mental anguish" is probative, as long as it "clearly establish[es] that significant emotional harm occurred." Or causality may be found by inference from egregious conduct on the part of a creditor, the serious nature of which carries a ready apparency of significant emotional distress. 390 F.3d at 1149-1150.

Under *Dawson*'s extended discussion, then, a debtor befallen by a violation of the automatic stay or the discharge injunction may recover damages for the emotional distress he incurs, without having to prove an actual pecuniary loss also resulting from the violation. The controls for the possibility of frivolous, feigned, or inflated claims are imposed by the court--in a principled application of the burdens to prove direct causality from the violation[10]; the requirement of significant harm; and a necessary materiality in the creditor's violation. *Dawson*, 390 F.3d at 1149. As CMS argues *Lodge*, *Lodge* stands for a more categorical rejection of debtors' subjective reactions that lack corroboration by medical opinion or other extrinsic evidence. However, that is simply not supported by *Dawson*--which gives better-developed and more responsive authority than *Lodge* presents.

Second, and more significantly: *Lodge*'s heavy burden and tone do not dovetail with the Eighth Circuit's relevant jurisprudence on remedies for violations of bankruptcy's injunctive relief. *In re Knaus*, 889 F.2d 773 (8th Cir. 1989) was an early application of 11 U.S.C. § 362(h)/362(k). In *Knaus*, the Eighth Circuit recognized that the automatic stay was violated by a creditor that had refused post-petition to release property it had seized from a debtor pre-petition under a writ of execution--an act that likely had pecuniary impact on the debtor's business operations, though this seems to have not been redressed by a quantified award of actual damages.[11] Of equal significance and more relevance, however, the *Knaus* court recognized as

---

[10] As opposed to the more pervasive and diffuse tensions of financial distress and the undeniable stress of having to submit to the bankruptcy process.

[11] The bankruptcy court had awarded $270.00 in attorney's fees and $750.00 in punitive damages to the debtor in *Knaus*. The Eighth Circuit ratified the award straight-up. Viewed now, the amounts probably reflect most, that *Knaus* came out of a different time.

12

material to its analysis certain post-petition acts by the same creditor that had no pecuniary character, but had a very personal impact on the debtor:

> The evidence showed that the creditor's president had attempted to persuade the debtor's church elders to excommunicate the debtor from the church for filing the bankruptcy petition.

889 F.2d at 774.

Clearly, this harm was not quantified to an award of actual damages either, whether cast in terms of inflicted emotional distress or otherwise. However, the Eighth Circuit cited this specific act as ample evidence of the creditor's "willfulness and malice" in trying to collect on a pre-petition debt. More importantly, the clear thrust of its affirmance was that the debtor deserved the vindication of an award of punitive damages for such an individually-directed violation, with its ready apparency of a personal impact on the debtor.

In *Knaus,* the Eighth Circuit envisioned one sort of showing to make out an actionable claim of a violation of bankruptcy's injunctive relief. *Hubbard v. Fleet Mortg. Co.* also featured an individual debtor's claim of substantial stay violation. There the violation had the form of a post-petition foreclosure sale without leave of court, a subsequent physical eviction of the debtor and his family, and the resulting deterioration of the house due to the creditor's long-term failure to occupy and maintain the structure after the eviction. All of this had been done or allowed by the mortgagee-creditor with full knowledge of the debtor's protected status in bankruptcy--and later in defiance of the bankruptcy court's orders to take remedial action. 810 F.2d at 779-780.

In affirming the finding of criminal contempt against the creditor and the imposition of compensatory sanctions and an award of attorney's fees, the Eighth Circuit concluded that "the [trial] court seemingly desired to compensate [the debtor] by allowing him enough money to complete the repairs as well as additional money for the years of inconvenience he was forced to endure." 810 F.2d at 782. It made this observation even though the lower court had not structured the sanctions directly on specific findings of "exactly what [the debtor's] damages were as a result of [the creditor's] misconduct . . . ." *Id.*

To be sure, *Hubbard* does *not* recognize the recoverability of damages in compensation for emotional distress suffered by a debtor in bankruptcy as a result of a creditor's post-petition act. Nonetheless, it too recognizes the *personal* impact that violations of bankruptcy's injunctive relief can have on a debtor--there, the manifest "inconvenience" of being deprived of an owned residence over an extended period of time, and the uncertainty of regaining the stability of a home place. The *Hubbard* court unfortunately did not discuss how the lower court classified and liquidated its award of compensatory damages (identified as $7,649.80). Nonetheless, its affirmance explicitly resonates with the long-recognized deference to a trial court's determination of a specific remedy for an adjudged contempt or a corollary violation of a court-imposed dictate or restraint. 810 F.2d at 782 (citing *United States v. United Mine Workers*, 330 U.S. 258, 303 (1947) for a proposition that "[i]n contempt cases, the trial court has discretion to fashion the punishment to fit the circumstances").

In the specific context at bar--a debtor's action for damages for violation of bankruptcy's injunctive relief--the Eighth Circuit has continued to grant such deference since *Hubbard*. *Garden v. Central Nebraska Housing Corp.*, 719 F.3d 899, 906-907 (8th Cir. 2013) (affirming district court's imposition of sanctions under § 362(k) on abuse-of-discretion standard). And in the Eighth Circuit, a debtor may recover attorney's fees to the extent that the fees were incurred in obtaining relief against a creditor in enforcement of the debtor's legally-cognizable protections and prerogatives within the bankruptcy process, even where the debtor does not prove up actual, pecuniary damages resulting from a creditor's adjudged violation. *Id.* (attorney's fees incurred to protect debtors' right to homestead exemption in bankruptcy case against creditor that had violated stay held recoverable in themselves, without proof of actual, extrinsic pecuniary loss resultant from violation; distinguishing *Lovett v. Honeywell, Inc.*, 930 F.2d 625, 629 (8th Cir. 1991)).

The structure of principles to be gleaned from this Eighth Circuit authority is the law to be applied to this matter. It is a palpable indication that, for a debtor's burden of production, the Eighth Circuit is not as stringently exacting on a claim of intangible injury from a creditor's violation

14

as the Eleventh Circuit would be under *Lodge*'s severe phraseology and outcome. It also establishes that the Debtors here might recover attorney's fees, in some reasonable measure, for whatever was necessary to vindicate their protection under a Chapter 7 discharge from whatever action CMS was taking against them as a pre-petition creditor, regardless of whether they prove recoverable actual damages.

The amount of such an award may be limited. *Garden* and *Lovett v. Honeywell, Inc.* clearly tie the recoverability of attorney's fees back into such proceedings as are necessary to recover and solidify the specific protections in and from bankruptcy that a debtor or a bankruptcy estate have under law. However, they appear to allow recovery only to that extent. To the point of CMS's argument, though, the Debtors would not be barred as a matter of law from recovering some reasonable, circumscribed measure of attorney's fees even if they do not prove up recoverable actual damages, or no more than a nominal amount of them.[12]

Under that authority, the Debtors have put just enough evidentiary material in the record for their case to survive this motion. Producing expert medical opinion on causality was one avenue of proof for them, and probably the one of greatest weight and highest probity; but their forgoing to do so will not bar them from recovery. Their own testimony on undergoing emotional distress would support a finding that they did undergo it; and--assuming their non-expert evidence establishes causality--quantifying such harm to an award of damages is a matter for trial. On proof of the right nexus to protecting the benefit of their discharge--i.e., in getting CMS's collection effort stopped--they may recover attorney's fees as an element of sanctions for an adjudged contempt.

Thus, the bottom line, as to the disposition of this motion: CMS does not have a knockout on this lawsuit, as a matter of law, notwithstanding the Debtors' failure to produce a formal medical diagnosis to corroborate their own belief that CMS's acts caused the numerous physical symptoms of which John Huonder complains.

---

[12] *In re Westman*, 300 B.R. 338, 347 (Bankr. D. Minn. 2003) will have its utility to the final analysis of the Debtors' case for attorney's fees here. It is a cautionary tale.

This is not to say that the Debtors ultimately will prove causality on a preponderance of evidence at trial. CMS's attorney points out that the Debtors earlier experienced emotional and physical distress from the root-source of their bankruptcy filing, the several disasters they suffered in their active dairy farming operation in and around 2010. To like effect, they apparently did not experience any stress during the pendency of their bankruptcy case, from having to deal with the FSA's claims of borrower misconduct on their part and then stipulating to the nondischargeability of a substantial debt to the Government. This measure seriously undercut the benefit of their bankruptcy filing, which arguably should have been a significant stressor. The import of those points of fact is contrary to the gravamen of the Debtors' complaint. That alone makes out a question of fact over causality. So far, the record has no exploration of any of the evidentiary avenues for resolving it.

And, of course, there are all the persisting mysteries. Why, really, did CMS's personnel keep issuing invoices to the Debtors for some unknown number of months, after CMS would have received the notices issued by the court for the Debtors' bankruptcy case? Were the Debtors seriously bothered by continuing to receive all the invoices they say they received? If they were, what did they do? If they did nothing beyond the one phone call, why?

CMS's commencement of suit in conciliation court would be understandable if it had followed outside of a bankruptcy context and solely in light of the Debtors' default in paying the invoices. But why was it sued out in the wake of the notices from the bankruptcy court? Did the Debtors view the conciliation court action as a threat, when they received notice of it? Why wasn't CMS's voluntary dismissal of that action enough to set the Debtors at ease--however obstinate Tim Osborne's statement to the court was, when he dismissed it? Why was this adversary proceeding commenced when it was, several months after that dismissal? Why was the last invoice issued by CMS, after both sides took their turns in going to law and the fact of a past grant of discharge in bankruptcy was utterly patent to CMS? Was there any significance in the name to which that last invoice was addressed?

16

What was Osborne's intention in just showing up at the Debtors' house, apparently without prior notice, to insist on talking with John Huonder? What really happened between the two men then? What was said? How reasonable was John Huonder in the reactions he says he underwent, during and after that encounter? And how reasonable were all of the Debtors' actions, reactions, and inactions over the stretch of several years, in which their lawyer now accuses CMS of acting like it was "with impunity"?

Through this motion, the parties and their lawyers failed to answer any of these questions. All of them bear on the relevant facts, per *Dawson*'s test and the rulings in the Eighth Circuit's corollary authority: the nature of the creditor's acts that are alleged to have violated the discharge injunction; the intent behind the acts and their relative egregiousness; the Debtors' actual responses to the acts over the several years; the causality-in-fact between the acts and all harm that the Debtors may prove up; and, if CMS's liability is established, the kind and measure of damages properly awarded to the Debtors.

So, this matter will proceed to trial. However, the Debtors and their attorneys are now well-aware of the burdens they face. As noted, the bare historical facts must be established, in their favor, as they recite in their narrative for the litigation. The crafted paucity of factual offerings for this motion leaves it far from certain as to whose version of the facts will be proven. Causality will be a key issue, as to the Debtors' case on liability.

If attorneys' fees are a major component of the Debtors' theory of damages, the limitations on recoverability imposed by the Eighth Circuit's opinions and *Westman* must be heeded. If the Debtors--and in particular John Huonder--seek an award of general damages for emotional distress, the Debtors' counsel must frame and present a coherent, principled theory for *quantifying* such an award. To date she has not done so. She has given no indication of any thought on the legal or factual dimension of this central issue.

If the Debtors and their attorneys do not live up to their obligations as plaintiffs-litigant under established law and do not meet their burden on these concerns, they will have no

prospect of anything more than a Pyrrhic victory: an adjudication that CMS violated the discharge injunction, but little or nothing in an award of damages. But for now: on the record made for this motion it certainly cannot be said that all the evidence points only in one direction, and that the Debtors lack the evidentiary means to make out a prima facie case on their pleaded theory of recovery.

Under CMS's *Celotex*-based premise for this motion, it is not entitled to summary judgment in its favor on the grounds it has argued. The Debtors will get their trial--to whatever outcome their proof merits.

IT IS THEREFORE ORDERED that the Defendant's motion for summary judgment is denied.

BY THE COURT:

*/e/ Gregory F. Kishel*

_____
GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE